The first case we are going to hear is the City of Rockingham v. Federal Energy Regulatory Commission. I guess, Mr. Orr, you are going to lead off? That's correct, Your Honor. Good morning. May it please the Court, I'm Bob Orr from the North Carolina Bar. I'm here along with Richard Bruce Collins and Julie Gantenbein from the California Bar. I'd like to reserve five minutes for Mr. Bruce Collins for rebuttal. We are here on behalf of our clients, the American Rivers Organization, but in particular the City of Rockingham, a small community in rural southeastern North Carolina, close by the Yadkin Pee Dee River, and not unlike many small communities around our state and economic issues, loss of manufacturing, and seeking to reclaim some economic vitality through the use of our natural resources. This is a FERC relicensing appeal in which FERC granted a 40-year license to Duke Energy. In a nutshell, Your Honors, this is about water flow. Anytime you put a dam across a navigable river, you invariably impede and restrict the flow of water downstream. And in the same vein, the water outflow from the dam was at one level, you advocated for a much higher level, and the agency found something in between, and you're saying they got it wrong. We are saying they got it wrong, Your Honor, and the original 50-year license, which Duke's predecessor, Carolina Power & Light or Progress Energy, whichever iteration it may have been, for 50 years, the minimum flow was 40 cubic feet per second, which is essentially drought conditions running through the 19-mile Tillery Reach, which is the stretch of river at issue here. What did they do? They raised the 330, whatever it is? That is correct, Your Honor. They raised it as part of their settlement agreement long before it even got to the point. I understand, but my point is it comes down to basically your disagreement with where they finally resolved with all the other agencies, federal and state agencies and interested groups at the 330. You think it has to be higher, and the real question is what is your standard to disagree with the process and with the agency? I had a hard time figuring out what you're disagreeing with. A lot of it is they didn't put in a separate paper, or they didn't do it in this form or that form, but I read a lot of their conclusions addressing your particular harms, and they did so in quite detail. It may come down to just a disagreement on judgment, and I don't think we review that. No, Your Honor. In all due respect, this is a failure on the part of FERC in two critical components of the flow issue. There is a minimum flow issue which essentially deals with the aquatic aspects of the river, and there are two arguments, and I will address those for you. One is they clearly used the wrong scientific method. Essentially, what they did in determining the environmental impact on the aquatic conditions of the river was to say... When you say wrong standard, where do you go into point to to say it's a wrong standard? They get to pick their standard, don't they? Your Honor, I think it has to have... It's a scientific conclusion as to what measures this, whether it's square area or footage or however, but they picked a method, and you say it's wrong. I don't know how you can do that based on this record. I think they disagreed with the scientific structure that we advocated for, but if I could explain what they did is base the aquatic flow on the minimum flow level, just a flat body of water, when in reality, anywhere from 5 to 50 times a day, the level of the tillery reach is dramatically fluctuating from extremely low to extremely high depending on power generation, and all of that, the dual flow concept is how you actually are able to determine the impact of the water flow on the aquatic life. From an Environmental Protection Act standpoint, they failed to consider it. They just used the wrong standard. The second factor, and this goes to the recreational use in addition, is that FERC just simply said, well, it costs too much. One of the factors they considered. They considered factors, they increased the recreational, there are a bunch of new facilities, there are a bunch of new accesses, they are spending much more money. They are not spending as much money as you want, but as a matter of fact, if I understand what you want, you want whole new turbines put in there that cost $50 million. They evaluated all this and it's a cost-benefit analysis and they spent 12 years doing this through the federal agencies and the state agencies and you are the only group that disagrees with what they did. I'm quite sure with driving that. Well, what's driving it is they did two things. Let me turn to the recreational flow issue. Throughout their order, throughout their briefs, they admit, we didn't pay any attention to recreational needs because of the low use historically of this stretch of the river. That's an inaccurate statement. They spent a lot of time on it. They put in new facilities for putting in boats, launching areas and other types of recreational devices. And so if you are going to be fair, you are going to have to say exactly what they did increase in recreation. You are saying it's not enough. Your Honor, the kinds of structural changes they made, whether it's vault toilets or picnic tables or more parking has nothing to do with the flow of water in the river. I mean, who's going to come use the facilities, new or old, if there isn't a stable flow and an environmental circumstance from a river standpoint that supports on a regular basis recreation. Well, they've increased it during the recreational period during the summer times and they've also increased it during the spawning times for fish. They've taken all of these things into consideration. They have made minor improvements, Your Honor. But the point is, they have been... How much does it fluctuate? In any given time frame, Judge King, it's between 1,500 cubic feet per second to 18,000 cubic feet per second. How much does that change like the level of the river? As best I understand it, when they are doing the minimum flow, it might cover my ankles and when they are in peak generating, it would be well over my head in fast-moving water. I can understand that better. Yeah. Thank you. And so, from a... FERC did undertake an analysis. In your argument, they didn't take the best analysis? When it comes to the recreation flow, Judge Wynn, I would say they simply ignored and said, well, we don't have any responsibility. And again, it was a bootstrap argument saying, oh, well, nobody's using this. We don't need to pay any attention to it. What is our review of this? Is it arbitrary? I would say it was arbitrary and capricious and an incomplete record. You know, FERC has a responsibility to balance under the Federal Power Act the power generation... We have to give them a lot of deference. We have to give them a lot of deference, don't we? Certainly, in the proper circumstances, Your Honor, they are entitled to deference. But when they don't complete the record, when they use the wrong scientific studies, when they say, oh, this costs too much. And if I could turn very, very quickly to the cost factor, the record would indicate that right now this power project is a cash gap. It's $24 million... How does the cost go to the power company? I mean, they're going to have to raise the rates? Is that where that ends up back at the consumers? I wouldn't think so, Your Honor. I think that the estimated cost was around $10 million for a $24 million project, leaving a $14 million a year net value to Duke Energy. But would it end up in the consumer rate for power? Well, I think the North Carolina Utility Commission would look at the aggregate. And when Duke bought this particular project from CPNL, it added... But in balancing, and Judge Niemeyer, in your Dow opinion that you wrote, you talk about the critical explanation and the balancing of the decision-making of the agency. And in this case, there was evidence that a true recreational expansion of this river for the community could generate easily $1 million a year to their benefit. The cost... How far is this from Rockingham? Well, it's a 19-mile stretch, so it's just within a few miles of the city. And so... And Rockingham had to get the benefit of the people down there fishing and boating. Absolutely, Your Honor. And that's what it's interested in. Economic development to help Rockingham and the Rockingham area. Yes, and FERC has a responsibility. They're not... So you're not here to try to protect the fish yet. I mean, somebody else is doing that. Well, Your Honor, the minimum flow has an effect on the aquatic life, which has both an environmental and a recreational component. So to the extent we're seeing the increased flows... But again, if I could go back because my time is fleeting here. Do they charge money for the recreational use? Not that I'm aware of, Your Honor. Well, why is that economic then? Because people come, they eat at restaurants, they stay, they camp, they buy supplies in the stores. I'm talking about people from outside of Rockingham coming in. Yes. You know, those people in Rockingham just go there when they want, can't they? Well, they can if it's usable. There's no gates or charges or fees. No. People from Greensboro and Raleigh go down there and build homes and stuff? They're within... Would that help that kind of... Absolutely. They're within an hour and a half of six million people. And in the rising recreational... Charlotte. Close to Charlotte, the Triad, the Triangle. But in the cost analysis, they need to explain why they say spending an extra $129,000 a year or $190,000 a year by Duke to increase the recreational flow is unreasonable. I mean, they're supposed to be balancing and give equal consideration to both the recreational and the environmental components. That's probably the crux of the argument that you're making that's causing the contention here. That is, you are saying that they have to explain why it's unreasonable when perhaps the view that's being taken here is that what we look to see is whether FERC has complied with what is required of it. Did it consider all of those factors? And if it did, there may be a better way. There may be people who disagree with it. But if it's not arbitrary and capricious, we're stuck with it. That's a correct statement of the law, Your Honor, but I think the record in this case clearly will show that FERC completely failed when it came to the recreation flow. They said, we don't need to because nobody uses it. Well, nobody uses it because there hasn't been any water in it for 50 years. Do you recall what page of their... opinion, their findings? I have the FERC brief, page 42, where they say that they don't... I'm talking about the... Order? The board's whole opinion, the big opinion. I did not bring that up with us. You don't have to know where it's located because I do know they discussed that. They did discuss it, but they consistently threw out, say, on the recreational flow, we don't need to do it because nobody's used this. Well, nobody's used it because there hasn't been any water in it, and that it costs too much. I'd like you to point that out to me, where they said they're not going to address it because nobody uses it, in their opinion. There's a bunch of sites here on page 42. There are, Your Honor. That's why I just put down the reference in the brief. For example, in paragraph 159, it's in the order they say staff concluded the amount of additional habitat would not justify the higher cost. They continue to rely, and that's throughout various parts of their order. They're talking about the fish. On the aquatic side. But they've also said the same thing on the recreation. Again, I have the quotes from the brief, Your Honor. What's the main quote? The commission staff did not, however, recommend flows beyond... Page 42, Your Honor. No, in the record. The EIS was at 314, JA 1525. Well, that's... It's where it is, what he was citing. But it's in the 2700s is the opinion of FERC. And I apologize for not having that specific... It seems to me that's all we're looking at. You can argue all the rest you want. But where they wrote down what they considered and what they didn't consider and how they decided, it's in their report. It's 400 pages long or whatever. The main order is in volume 8. And it seems to me you ought to be able to point to where they discounted. I seem to remember reading they gave quite a bit of attention to the recreational. I'm trying to find that. But you're saying they didn't pay enough attention to it. And you're really the... Rockingham is out front on this for North Carolina. I mean, your position is it's a benefit a lot more than Rockingham. But the state kind of threw you over, didn't it? Well, they did. And I'm beyond my time if the court will allow me to either answer or respond. I mean, it's part of the settlement deal where the utility goes in well in advance of the relicensing. And without being unfair to them, they kind of get all the various stakeholders and they hand out, well, here's a land conservation easement for you. And here's 10 boat docks for you. And we'll put a new picnic table and parking here. And you need to sign on. I mean, the position for Carolina Power... It wasn't quite that easy. They even had litigation in both state court and federal court. They had to satisfy and they had to satisfy all those... It's been a complex interchange, complex negotiation. They consulted federal agencies, state agencies, and even consulted your town and addressed each of your things. They made even changes in response to it. I find it hard to say that this was a contrived deal put together in the back room by giving them a boat dock. It seems to me you ought to be a little fairer... I apologize. I'm not trying to say that they didn't do a lot of things. But it all goes back to how I opened the argument. This is about water. This is about... And this is a public river. This isn't Duke's River. This is an extraordinary resource for our state and the community. So when you go back to your seat, take a look at JA 3297. I think that's where they say that... FERC says we don't have to consider the recreational demand. But in conjunction with that, also look at it from the light, do they have to elaborate? I don't know of any authority that says they've got to explain this. If they say summarily the licensing conditions were consistent with the comprehensive plan, they've got this recreational plan, they've got the action plan on the wildlife, if it's consistent, do they have to elaborate? And if so, tell me what that authority is. Because I haven't seen anything that says they have to explain, elaborate. You can do that when you come back. Mr. Ruth Collins will explain that. And that would be Judge Niemeyer's opinion in doubt. Thank you, and we would ask this be reversed. Maybe I made a mistake. You're on. Good morning, Your Honors. Holly Kafer for the Commission. Well, I was going to start out by pointing to JA 3297, but Judge Wynn has now done that for us. I think paragraph 112 is really the heart of... I've got the benefit of a computer here. It took me a little longer. But paragraph 112 really is the heart of the Commission's analysis of recreational flows. And just to sort of start a little more broadly, the Commission recognizes Rockingham's valid interest in promoting recreation at the project. And the results of this new license really do that. In addition to the settlement terms that provided for substantial recreational improvements, the Commission itself imposed additional recreation requirements. In fact, the Commission only imposed nine conditions of its own in this case, and five of them went directly to recreational improvements. But did the Commission say that it did not have to consider recreational demands? Not that broadly, Your Honor, no. The Commission limited its analysis to... But it didn't need to. How about that? The Commission limited its analysis to the types of recreation for which there's the most interest in the Tillery Reach below the dam. Did they impose conditions that improved the recreational use there? Absolutely. What were those? First, the minimum flows themselves do increase the water that's available for recreation in the Reach. That's the 330 cubic feet per second. And then the summertime seasonal recreational flows that the Commission required, the additional... I think it's up to 1,950 acre feet. Where was it improved from? Going back to the original 40, I mean, it didn't take much to improve. Right, but this is a... And it's interesting because, you know, elsewhere and throughout the consultation, both Rockingham and American Rivers acknowledged, even in their request for rehearing to the agency, that these were significant improvements from the existing license. And that's not how the Commission is defending it. The Commission is defending it as it is adequate to... Why wouldn't they look at a study to look at in terms of additional opportunities? Whenever you're doing an economic study or you're looking at how you can help a community, there's, of course, a marriage between the city and the surrounding community and this commercial enterprise that's going on. And it seems like to me there's such a mutual benefit that can arise from it, although I know Duke is not involved in the recreational activities. Why would you not look to see how you could enhance or give greater opportunities even beyond, let's say, we've given some improvements? We were not inconsistent with the plan of considering those factors. In other words, it looks to me if you look at it really just what it is, they met the minimum required. Here are the factors. Oh, we considered everyone and we're not inconsistent. Well, we are consistent with them. But why would there not be some higher duty to say, what can we do to make this really not optimal or not maximum but at least vibrant additional opportunities? That would make the town probably happy and others. The Commission did find that the recreation flows that are provided in the new license are, in fact, optimal taking into account the Commission's responsibility to balance all of the competing uses. In other words, under the Federal Power Act, the Commission cannot put its thumb on the scale in favor of recreational development or economic development. It needs to look at the totality of all of the competing interests at stake here. And that does include the economic cost of those flows as well. That said, the Commission really did take a hard look at recreational flows here. It did require increased flows. In fact, the flows that are required, the 1750 to 1950 acre feet. Is that the key term, hard look? That's the NEPA term. In fact, I probably used the wrong one because this is not a specific NEPA challenge on recreation flows. So let's say it did a detailed analysis, right? Detailed analysis that we had to do? Yes. And it provided substantial evidence. That's the other key term, right? In support of the choice of flows. I do want to point out that the recreation flows that are provided when taken in with the minimum flows that are required for aquatic habitat, that's the 330, and added together with flows from tributaries, allow for 20 boating days during the recreation season, plus the three summer holidays, if you will. What's the recreation season? The recreation season is, I believe, May 15th to Labor Day. Could be September 15th. I'm not quite sure on the end date. But that's the time period during which the recreation flows are allocated. And the commission's analysis showed that by releasing just a certain amount on each weekend, essentially, or every other weekend, it would result in boatable flows for John Boats every other weekend during the summer, which is a substantial improvement over the existing conditions, of course, and really shows that the commission did take a detailed, thoughtful analysis to this. Let's see. The one last thing I wanted to point out on recreation flows is that no one disputes that the 330 cubic feet per second that's provided for minimum flows is already enough to float canoes and kayaks. So the analysis that the commission did was to say, how much more can we provide in order to be able to float what's called a John Boat, which is another flat-bottomed boat, but it does sit deeper in the water. And so the commission really did go the extra mile here to figure out how it could allow for additional types of recreation, keeping in mind that fishing is really the main recreation in Tillery Reach. Fishing? Yes. Not swimming or camping? Not swimming. No, there's some camping. I think the record is replete with surveys that were done throughout the consultation period. And all the fishing is by John Boat? All the fishing is actually bank fishing. That is the most popular activity. And I believe the commission references that particular fact in Paragraph 112, the magic paragraph of the rehearing order. Bank fishing is the predominant recreational activity with 921 user days per year. Swimming only has 20 user days per year, and canoeing has two. So the commission focused its efforts on trying to not only just improve recreation, but improve it for those activities that the people in the area are already seeking. The other thing to keep in mind in terms of the attraction of recreation at the project is that right now we're talking about Tillery Reach, the area below the dam. The big draw for recreation in this area is actually Tillery Lake above the dam with the water that's impounded there. And so there's homes and plenty of boating and fishing opportunities up there as well. Why would the commission not use the scientific method for measuring the project's overall effect? Why would they not use that kind of a method? So the commission found... I think we're discussing now the difference between weighted usable area and dual flow analysis. The commission found that it wasn't necessary to use the dual flow analysis that petitioners supported, and that's because that analysis is really reserved for when you're trying to reduce the maximum flows. So we have flow fluctuation here, and everybody recognizes that. The commission recognized the impacts of that as well. And what the stakeholders had focused on throughout this very lengthy proceeding is increasing the minimum flows to close the gap, not decreasing the maximum flows. Dual flow analysis, a method that petitioners would prefer... What's the effect of fluctuation when you use your particular, just looking at the minimum? How does that work? When you don't use the scientific method and instead use your method, which is focused on the minimum flow requirements, how does fluctuation affect you? It does occur. It does occur, and the commission addressed that and found that, yes, of course, the weighted usable area analysis that the commission used does not specifically address the fluctuation, but the commission offered valid reasons for using that methodology in any event. And that was that it allowed the commission to look at the impacts to a wide range of species, a larger number of river reaches, a bigger area, under more flow conditions. So it had good reasons for using weighted usable area. And then, as I've already mentioned, it also had good reasons for not using dual flow analysis, and that's because no one, not even petitioners, was advocating a decrease to the maximum flows. I do want to point out that the commission did address the negative impacts of the flow fluctuations, in particular in the license order at paragraph 159, JA 2728, citing the final EIS at 108 and 156. And there, the commission said that, yes, it's basically modified seasonality. It will impact adversely some aquatic habitat, but that Duke's proposed flows, the 330 cubic feet per second, again, that's coming up from 40, combined with limits to its ramping operations, so that's how quickly the project comes online to start generating and how quickly it goes offline to stop generating. So help me out. I understand it will affect aquatic habitat based upon use of the minimum flow requirements, but that sounds like that's more of a common sense outcome. We just know it will. But you have a scientific method analysis that really takes it into account. Why would you not use that as opposed to we consider it, so to speak, and yes, it will affect it. And it satisfied our minimum requirements for looking at the practices. So I don't think that the commission was first. I mean, I think we've all recognized that the commission is not required to use the best methodology. It did reasonably explain. And that is the petitioners have methodology and they have methods for which they contend would be, they say optimal would be the correct way to do it. You say you considered it, seems to me, minimal with what is required. Even when you look at those comprehensive reports that were done, you didn't go through an explanation of why you did any of that stuff. You said we considered the facts. So summarily, we looked at what was here. We looked at this. There's no explanation or anything to it. And the issue that seems to be is, is that enough? Is that all you have to do? Or do you have to give some type of consideration and evaluate how this all works? Or can you just summarily say they are consistent? I don't think that anything that the commission did in this proceeding was summary or summarily done, your honor. Let me tell you what they gave to those comprehensive plans. You've got these comprehensive plans here. It seems like to me they said they're consistent. This is consistent with what's going on. But I don't know the evidence in the record that supports that other than the commission is saying. Right, so on the comprehensive plan issue, the commission did not go into detail on its consistency finding by citing. That's the point I'm making. They didn't go into detail. They didn't tell you anything is consistent. And I'm sorry, I thought we were talking about recreational flows and minimum flows. That's fine. I can bounce around. So on comprehensive plans, what the commission does is it reviews all of the plans that are submitted. And it uses the objectives and goals that are stated in those plans that are filed under Federal Power Act 1082 in its environmental impact statement and in its orders. But you won't see citations on every page to the North Carolina State Outdoor Resource Plan, to the South Carolina such and such plan, or the Fish and Wildlife Service such and such plan. As simply a matter of the way that the documents are written. But that doesn't mean that the impact statement doesn't take into account those goals and objectives. And really, the impact statement and the commission's orders are replete with references to the goal for this reach of the river is to improve aquatic habitat for shad, for instance. Or to allow or improve aquatic habitat for sturgeon below Blewett Falls. The commission is simply just not citing the plans on each page. And that's why the commission explained that it does not go into detail unless it needs to make a more rare inconsistency finding under 1082. In which case, then it would detail its analysis to allow the opportunity for that challenge. Here, I think most importantly, petitioners did not raise a dispute with particular plans other than two in their request for rehearing. It's difficult to see how far the court could go in even addressing this issue. We explained in our brief that the commission did address more specifically the resource objectives and goals of those two plans that they actually identified in their request for rehearing. If they had identified more plans, the commission could have offered more analysis, but they did not. All right. Thank you. Thank you. Mr. Toth. Good morning, Your Honors. Brian Toth from the Department of Justice, representing the Secretary of Commerce. Just to provide a little context here, the Secretary acts through the National Marine Fisheries Service, which is the expert agency with whom an agency like the commission will consult under the Endangered Species Act to determine, to make sure that the license will not jeopardize a continued existence of endangered or threatened fishes like the sturgeon that spend part of their life in a marine environment. Here, the service produced a comprehensive biological opinion reaching the conclusion that the license and the minimum in-stream flow conditions in the license would not jeopardize sturgeon species. That conclusion is supported by substantial evidence in the record. Nothing that petitioners have presented in their briefs have demonstrated that the service's conclusion was irrational. The focus of the case and the presentation until now has been on the tillery reach. And that's where most of the petitioners spend their time in their brief. But the sturgeon only are present below Blewett Falls Dam, not in the tillery reach. So really, this is almost a bait and switch, if you will, of the concerns about in-stream flow. Blewett Falls is the last dam south on the river? That's correct. It's the seventh dam as you go down the river. I believe that's right. The sturgeon can't get above the first dam they come to. That's the first one they come to. When they're coming up from near the ocean. And they've only been found- They can't get beyond the first dam. They've only been observed about 19 river miles downstream of that dam. They're not up already to the dam? Not as far as the record demonstrates. That's South Carolina? 19 river miles. I think it's close to the border. Pardon? I'm not sure if that's in South Carolina yet. The dam is in North Carolina? The dam is in North Carolina. Both these dams are in North Carolina that we got here. Yes, that's correct. So the fluctuations that occur that the petitioners are contending should have been measured by this different scientific methodology occurred to a greater extent in the tillery reach than they do below Blewett Falls. And this is just from their reply brief. Assuming what they say in the reply is accurate, compare pages 20 with pages 34 and 17, and they say that there's a 55-fold difference in fluctuations in the tillery reach compared to only a 7-fold difference in fluctuations below Blewett Falls where the fish are. So help me out. I'm trying to understand here what the contention is. The contention is you've got the Fisheries Service. You've got to do- You've got a certain job. And to get that job done, at least as I understand it, you're required to be provided with the best available information and data. Is that right? That's correct. And in this instance, it's the type of data that we just discussed that were provided to the Fisheries Service. And the contention is that's not the best available data. They may provide you some information, but even you, after you've got their information, you say, well, there's going to be some type of incidental. What is it, a short nose? I don't know if I've ever eaten a short nose. Can you eat a short nose? No. No, you can't. Well, you know, so you have some effect there. And the contention is that although you provided this information, it doesn't meet the best available requirement for 7A2. Is that the problem? So that's their contention. So there are two responses. One is that what they're asking for is additional studies. They want this model that they described to be run on more data. So the data isn't yet available. It has to be generated by Duke. That's the first point. And the case law from the D.C. Circuit, the Eighth Circuit, is pretty clear on this, that best available means you don't have to – it doesn't mean you have to generate new studies. The second point is that for sturgeon, which are bottom-dwelling fish, everybody agreed from an early point, all the different resource agencies got together, including the service, and agreed that minimum in-stream flow ought to be the focus because, after all, these fish live on the bottom. They eat off the bottom. They spawn on the bottom of the river. And unless you have enough flow to cover the river bottom, they don't have enough spawning habitat. So that was the bottleneck that was identified. Let me ask you one question, at least in terms of the methods. Do the type of methods that are best for your consideration, do they differ depending on the type of water flow or the river or what's being considered? Or can you look at one river, maybe Missouri, and one in North Carolina, and say, well, the best method would be this? It could differ according to the river, the species. It really depends on the facts of the particular case and the record here. And in this instance, when you got this weighted area method, usable area method, did you also know there was some other data available, like the dual flow? Yes. I mean, there was this dual flow method, but, you know, the data hadn't been produced. And the service explained that the other method, the method that was used, Index C, focused on the lower, what they call the lower end of the habitat curve. Now, that's a lot of jargon, which just means low flows, because that's what everybody understood to be the limiting factor. The data that was at least the petitioners here contended they had on this, and they say it's better data. You knew of this, or you did not, or that wasn't provided to you? It wasn't provided. We knew of the methodology, and actually some limited data were used from that method. Is there a method for them to provide data to you in addition to the commission, or has it just come straight from the commission? They could submit comments to the commission. I mean, they did submit ample comments to the commission. It would require their consultants to – But can they submit data? With their comments, sure. Sure, and that would have to be considered. But here the record demonstrates that the conclusions reached by the service were rational. It should be upheld. All right, thank you. Mr. Bruce Collins? Thank you. May it please the Court, Richard Bruce Collins on behalf of the City of Rockingham and American Rivers. This case at its heart is about the failure by the Federal Energy Commission and the National Marine Fisheries Service to complete their respective records for their decisions. Let me focus specifically on the methods which they used and those that they refused to use, and then at the end I'll cite to the cases that are the basis for our belief that their failure to use the best available methods, or even reliable methods, is reversible error. So beginning with recreation, Judge Niemeyer, you asked for the record citations. I found them. There must be 20 pages of discussion on the recreations in the thing. There's part of the order, they have to supply a plan, they go specifically to every trail, all the contributions they have to make, all the improvements they make. I don't quite understand the comment that they didn't consider the recreational. It's at length. I'm now looking at pages in the 2700s and 2760s, 2750s.  I don't understand how much money they have to contribute to the trails, to the various agencies. It baffles me that we can't get a dialogue on what the record actually shows. And, Judge Niemeyer, my hope is that we can. I agree with you that there is extensive analysis of recreation in this record and specifically in the final environmental impact statement. Our beef is that the commission did not study recreational demand in the Tillery Reach, and the citation for its refusal to study recreational demand is found at Joint Appendix 3297 and also 3299. They refused to study it. And then with respect to the relationship between flow and suitability for different forms of recreation. They were required to. That's the question. You said they refused to study it. They say it's not inconsistent with plans and they looked at it. Are they required to explain, do anything beyond just say, stay out? Your Honor, their own rules, and specifically 18 CFR 4.51, and there's a subsection I can't remember, requires the study of demand, recreational demand. What do you mean by recreational demand? The potential use by families or others for swimming, canoeing, kayaking, any form of recreation. So you're not talking about the actual use. You're talking about the potential down the road. Judge King, I'm talking about the potential that a given reach, this reach might support additional recreation. Well, it says in Article 408, recreation plan within nine months of the license issuance, the licensee must file with the commission for approval, recreation plan for the Adkin Pee Dee River, which includes the following. And it goes page after page talking about what they have to do, specific recreational things. They have studies that showed what the recreational use was per person, per day, kayaking, fishing from the shore, fishing from boats. They covered it all. I'm just totally baffled by these broad statements that say they didn't consider it. Now, you may disagree with it, but they are imposing new vaults, new trails, new landing docks. They've funded a state agency to promote it. They want the education. What's going on here? I mean, what do they need to complete? Judge Niemeyer, they need to do two things to complete the record. You disagree with their flow, but they've increased the area. They say it increases the boating. They are very aware of the amount of boating, when the boating has to be high, the square footage of the lake. They consider that for recreational persons. They have it increased during the recreational season in the summer. This is all in the record. And to say that they didn't consider it, it's just unsupportable. Judge Niemeyer, we're saying that the commission did not consider the potential for a higher flow to increase actual recreation. They said the cost benefit would require new turbines and a $50 million investment, and they say it was not justified by the demand. And the demand went much further than Rockingham, the city. It went to the whole area. They looked at where people came from, how many people used it on a given day. They proposed plans. You're not accommodating the evidence in the record in order to make your argument. Your Honor, I believe I've said twice that I do agree with you that there is extensive analysis in the record. Our dispute is that the commission did not use a method to evaluate recreation demand and how that demand might be met by higher minimum flows. And they did not use a method, a standard method, to evaluate how alternative flows would affect different forms of recreation. My time is up. But they didn't use the method you wanted them to use. They didn't use it. They looked at the current use and the river's capacity for fishing, but they didn't go through this futuristic look in terms of how it could be more opportunistic in doing this. That's correct. And even left open, they said if the demand is different from what they assume in the future, they invited that the license be opened to accommodate the increased demand. They're trying to promote the demand, and they have quite a few long list of items on recreational use. And then they've left that open, too. Isn't that right? You come back so many years to open it up? Yes, Your Honor. There is permission for a reopener. However, our case challenges the sufficiency of the record on which they made their decisions. And, Judge Wynn, you asked specifically for cases. Well, they listed all those, too. They listed two pages of all the studies that were provided then by various entities with respect to recreational use, the surveys, who was using it when, what type of recreation was being used. They considered all that. Your Honor, they considered all that in the context of a river reach where only three people per day actually used the water. This is a 19-mile reach. It's a quarter mile wide. They did not use the methods necessary to evaluate whether higher minimum flows, in addition to the capital improvements, would result in greater recreational use. You had some cases, Wynn? I do. Your Honor. Just give the names. Green Island Power Authority, Dow Chemical, excuse me, Dow Agricultural Sciences, Seeding Hudson, and State Farm. Okay, thank you. Thank you. We'll come down and greet the counsel in this case and then go on to the next case.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.